Good morning, Your Honors. My name is Gwendolyn Payton, and along with John Neeleman, I represent the appellants in this matter. This case involves a challenge to a regulation promulgated under the Magnuson-Stevens Act. The appellants here are a company and two individual captains of vessels owned by the company. For convenience, I'll refer to the appellants as FCA, or Fishing Company of Alaska. FCA argues that the enactment, the enforcement, and indeed the amount of penalties assessed against them under the program at issue, the Vessel Incentive Program, or VIP, violates the Administrative Procedures Act, the Magnuson-Stevens Act, the Due Process Clause, and the Equal Protection Clause. I want to start by trying to encapsulate the basic facts of this case, because I think in those facts, it's apparent what the constitutional and other infirmities are here. And it's relatively simple. These vessels are trawl fishers. They have a net that they tow behind them. When the net comes out of the water, that is the first time the vessels can tell what they have caught. They fish for yellowfin tuna, or I'm sorry, yellowfin sole, and a byproduct of the fishing activity is bycatch, or other species that come up in the net. And the agency terms this bycatch. Bycatch is a problem which has admittedly plagued this and all fisheries since its inception. There is no one here who wants bycatch. Bycatch means that the fisheries will close sooner, because when there is a certain amount of bycatch that is caught, then the fisheries is closed. The halibut bycatch is the problem here. And it's important to note that this is an allocation issue. Halibut are not endangered, but there is allocation between a thriving halibut fishery and the yellowfin sole fishery. Now, in 1991, the agency decided to deal with the bycatch issue by implementing a program called the Penalty Box Program. And again, this is not the regulation we're talking about specifically here today, but it is important because it was the precursor of the Vessel Incentive Program. Under the Penalty Box Program, the idea was that the vessels, when they hit a certain amount of bycatch, would need to stop fishing and go back to port. The Secretary of Commerce determined that this violated the pre-deprivation hearing requirement of the due process clause, because the vessels could not be required to stop fishing based on unverified data. So the agency went back and implemented the Vessel Incentive Program. I want the court to focus on what the agency looked at at the inception of the Vessel Incentive Program. They did not consider the threshold question that really goes to the heart of what the agency is trying to do here. How can we reduce bycatch? Can the vessels reduce bycatch? And it seems somewhat obvious, but that is one of the basic problems with this regulation. There is nothing in the record to address the question, first off, whether or not these vessels can change their behavior in a way that gets the desired result. Is there an affirmative act they can do to reduce bycatch? Without that threshold inquiry, the next problem is apparent, the requirement of a cost-benefit analysis. There is no cost-benefit analysis in the record, and indeed there can't be without addressing the basic problem of whether or not this is even something that is possible to do. The bycatch rate is also an important element of the regulation and its infirmity. The bycatch rate is how much kilograms per metric ton of halibut can be caught before the fishery is closed. Now, as a practical matter, many of the boats are able to comply. So it seems to me that leaving to the boats how they're going to implement this is common sense. Some boats need to move to another place, some need to lower the nets or raise the nets. And if there had been very specific regulations as to what each one must do, I think you'd be here telling us they're over-regulated. Well, Your Honor, I want to start addressing that by challenging the assertion that some boats can comply. Indeed, some boats can comply, and in four out of the nine vessel weeks that the vessels before you, the Alaska Ranger and the Alaska One, were fine, they did comply. And they were better than the fleet in many, many of the vessel weeks. But the fact is it's random. The vessels and the fleet at large cannot comply or did not comply with the regulation at all during the summer months. And the reason for this is because the bycatch rate was set based on a nine-year average for the domestic and foreign fleet for a nine-year period. That's repeated in the brief a number of times, but my understanding is that two things happened. One, there was an acknowledgment of the higher bycatch in the summer, and that's pretty clear in the record. Second, with respect to the bycatch, it was actually determined to be a certain level and then raised to five in order to give more leeway to accommodate the summer, even though the statistics would, at least in the view of the government, permit you to actually promulgate a rule at the lower level. So with those two factors, and there may be others, why isn't that sufficient to sustain the regulation? Your Honor, I think if you look at what is published in the Federal Register, there is no discussion of variation in the biomass. And the agency testified before the administrative law judge at the hearing that what they did was take this gross average without accounting for fluctuation in biomass through the nine-year period, which is going to be too low for the summer months, and indeed it was somewhere around three kilograms per metric ton, and then took one quarter from 1990 of a subset of the fisheries and used those two pieces of data to develop the bycatch rate without factoring in fluctuations due to seasonal changes. Now the fact that the agency came back in the middle of the season and said, well, we'll move it up from three to five, doesn't change that statistical problem. And the question here is what does the agency have to put in the record, in the Statement of Uses and Purpose and in the Federal Register, of the fact that the requirement is clear. The agency has to show this court that it's considered all aspects of the issue. Certainly the fluctuation in biomass is an important aspect of the problem. Here's another problem that the government cannot explain. Why, if we're using data from a nine-year period and this one seasonal period from 1990 of a smaller subset of the fleet, are we assessing the penalties based on vessel months? It doesn't jive. And part of the problem with that is when you look at the data, and this goes back to your question, Your Honor, when you look at the data, the regulation is admittedly not working because the fleet cannot comply in the summer months. And indeed, these vessels are doing better than many of the other fleet members, and yet the enforcement action is against FCA and FCA only. In July and August, as I mentioned, in four out of nine weeks, these vessels were within the bycatch rate. Now, the problem that this all leads to is, given this fluctuation in the random nature of the results of bycatch, the boats are at sea, they hit a school of halibut in the first week, have a high bounty catch rate, what are they to do? And this really gets into the heart of the due process issue as well. They don't know how to comply. And the government is saying two things at once. It's saying, move, try going into a different area. Or at the same time, once these vessels got into the administrative law judge hearing, the response to them was, you should have stopped fishing. These two things are incongruous. When should the vessel stop fishing? At what rate should the vessel know that it is required to stop fishing? Why is it that causing the vessels to stop fishing based on unverified data will also, will violate the due process clause under the penalty box program, but that is exactly what the administrative law judge was saying to the petitioners when they challenged the regulation. The administrative law judge is clear. You did these things to try to mitigate, move the vessels, shorten, lengthen tows, implement your own by-catch program to reduce by-catch and try to make up for the problem with the lag in the data that the agency has. But the problem is that there was no notice in the record whatsoever of how the vessels were supposed to respond to this new regulation implemented mid-season. It was implemented while the vessels were at sea. I guess that you'd recognize that there's a very serious problem with by-catch  The agency set up a process, and your client is just agreeing with the process, but doesn't the agency, aren't they due deference in the way that they're trying to solve this problem or at least mitigate it? Absolutely, Your Honor. But to give that deference, there has to be a record. You have to be able to review what the agency considered and make a determination giving deference to the agency and its expertise that it considered all aspects of the problem. And I think the record here is so defunct of those basic issues. Did they consider relevant data when they were doing vessel months for penalties and considering this broad spectrum of data? And did they consider important scientific evidence such as the fluctuation of biomass? None of that is there for you to see that they even considered that. Well, as I understand it, one of the ideas of the commission is to put the responsibility on the fisher to determine how best to alleviate this. And there are several methods. Apparently, your client was unsuccessful in that mitigation. Indeed, the whole fleet was unsuccessful in this mitigation. The program admittedly did not work. And FCA, in the record, is the only entity that was prosecuted under the program. And one area of relief that FCA asked for is to ask this court to remand, to reopen the record, to allow discovery on the agency's statements now that this program was unworkable, a failure, and bankrupt. Unless the court has any questions it would like to address right now, I'd like to reserve the rest of my time for rebuttal. All right. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Would you address Ms. Jones? Yes. There are several questions raised by FCA that I think the government needs to address. One is that the government didn't take into account appropriately this biomass fluctuation. A second is that there's a mismatch between the yearly and monthly statistics in terms of what you end up with. And then a third area is, in their view, what I guess is kind of a catch-22 of once you are out of compliance, whether in effect you have to stop fishing or whether you then go fish at your own risk. So if you could go back and start with the first one, and that's the summer biomass problem. Thank you. Thank you. Thank you. Thank you. Thank you. The second point is the mismatch between the data collection of yearly, quarterly, and the enforcement mechanism of monthly. Thank you. Thank you. Thank you. Thank you. Thank you. Weren't they always higher than five, historically? Thank you. And then you alluded to it briefly, but maybe you could touch on the stop fishing. Their argument, I understand, is that basically the EEOJ says, well, you should have just stopped at that point given how high you were, and that that's not a realistic option or order to do it that way. What is the government's response? Thank you. Thank you. Thank you. Thank you. Ms. Jones, this is Judge Fletcher speaking. Could you explain the interplay between the statutes? One seems to limit the penalty to $25,000 per vessel or per incident, and another which allows the higher penalties, and I wasn't quite sure how those two fit together. Thank you. Thank you. You have about one minute left. Two minutes. I think that, thank you. We'll hear from the fishing company on rebuttal. The clock is taking a vacation here. I'm a bit confused. You have about six minutes left for your rebuttal time. Thank you. And I'll try to give you an approximate one-minute warning. Thank you, Your Honor. In response to the Court's question about whether the fleet was able to comply in July in any of these years, I'd refer the Court to page 9 of the appellant's opening brief, which shows indeed that through the data that the agency did disclose the late 1980s, that the fleet was never able to fall within the bycatch rate, and the rates were well into the teens and 20s each year. On the issue of the $25,000 penalty limit, Your Honors, this $25,000 limit is in the precise area that the VIP is in. There is a general Magnuson-Stevens Act penalty provision, and there is a specific penalty provision relating to the VIP program and the North Council's ability to assess fines under this. It's the exact program that we're talking about. The case law is manifestly clear that when there is a change in a penalty amount, while a case is on appeal, the Court shall apply the limitation at the time of appeal, not at the time it was assessed. The thing I want to come back to, because I think it really is critical, is this feasibility issue. Is this regulation feasible? The data shows, contrary to what the government said, that the industry could not comply during the time at issue in this case. Perhaps then they should just pass a regulation that there shall be no fishing for yellow tuna sold during the summer months. It's possible that, you know, that's a different case for a different day. It doesn't, I mean, there are all sorts of draconian other results that we could come to that might not have the same particular problems of this one, but it doesn't avoid the problem that we have before us, that it was not feasible looking at data from a different period and saying, well, it's possible at another hypothetical time for the fleet to comply, doesn't change the problem here. Well, I was only suggesting that you're inviting draconian measures. I don't think so, Your Honor, because I think that the process does work. We're here trying to work this through, and there is industry involvement. We've already, you know, this has always been collaborative. It doesn't mean that mistakes are made. Nobody denies the VIP program was a mistake. It doesn't work. And in 1991 and 1992, the time period we're talking about here, the fisheries were closed early. The program did not work. And the question really that this Court has is, why are these one entities being penalized under this defunct program in the year 2003? It does not comport with the constitutional standards and the duty that the regulators have toward its regulated entity. It just doesn't, it's incongruous. What really the courts have said time and time again is that when a measure will threaten massive dislocation or imperil the existence of the industry, and I really want to emphasize to the Court that this will, this, if it had been applied, as the agency is attempting to apply the program against FCA and FCA alone, it would have shut down the industry. None of these vessels could have fished, and, Your Honor, that would have the same result. And I don't want to talk about necessarily whether or not that result is constitutional or violates the APA because all I need to say at this juncture is if the agency wants to do that, it must, it must put something in the record to show this Court that it considered the costs and benefits to the industry of that action. And that is indeed what the agency is saying. This is like a regulation that says you shall stop fishing without considering the cost of that. That infirmity is like many of these courts' decisions with the Administrative Procedures Act. In particular, I want to call the Court's attention, I realize I don't have much time, to the Alvarado case from the Ninth Circuit, which is quite similar here, and it deals with how thorough the cost-benefit analysis must be, particularly when this is something that, again, I emphasize, we're not talking about mere monetary fines. What the ALJ said, this company should have ceased participating in the industry at all. But that has to be set out quite thoroughly in the record. And one thing that the District Court said that I think is worth noting is that there was a cost-benefit analysis done, and that is available in the record for the Penalty Plots Program. And this Court in the Alvarado case at footnote 18 noted that a cost-benefit analysis in another regulation cannot suffice to salvage a different regulation. The problem of the administrative law judge telling the vessel for the first time in the hearing when it was attempting to exercise its right to a hearing that it should have stopped fishing is just not solved. There is no explanation here for the Court that the government has been able to come up with. And it is not that industry is asking the government for a recipe on how to fish or saying that that would salvage the problem. What it is saying is this Court has to have evidence that the agency considered relevant issues when it implemented this program and when it then assessed $200,000 in penalties against industry. And for the first time told them that by continuing to exercise the right to fish, and indeed it is a right, that it needed to, that it had made a mistake by not stopping. The problem with the notice requirement is that there just isn't any evidence before you to allow an answer that is satisfactory under the precedent to the question of what should the vessels do in response to adverse reaction or an adverse data result under the VIP program. Thank you. Thank you, Your Honor. Thank you. To both counsel, we're sorry you couldn't be here, Ms. Jones, and we wish you luck. The case of Fishing Company of Alaska v. United States is submitted. Thank you. Thank you.
judges: Hug, B Fletcher, McKeown